CLERKS OFFICE US DIST. COURT
AT ROANOKE, VA
FILED

OCT 0 2 2020

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| FRED EUGENE JONES, Jr., ) | |
|     Petitioner ) | Case No. 7:19-cv-00796 |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| LARRY EDMONDS, Warden, ) | |
| Lunenberg Correctional Center, ) | |
| ) | By: Michael F. Urbanski |
|     Respondent ) | Chief United States District Judge |

Fred Eugene Jones, Jr., a Virginia inmate represented by counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2011 conviction in the Circuit Court for the City of Salem on one count of malicious wounding. The respondent filed a motion to dismiss on February 3, 2020, to which Jones responded on April 2, 2020. ECF Nos. 6, 15. For the reasons stated below, the court **GRANTS** respondent's motion to dismiss and **DISMISSES** Jones' application for habeas corpus relief.

## I. Background

On May 21, 2010, in Commonwealth v. Jones, No. CR-10000239-00 (Va. Cir. Ct., filed May 21, 2010), a City of Salem Grand Jury charged Jones with aggravated malicious wounding of his two-month old daughter, S.J., causing permanent injury, in violation of Va. Code § 18.2-51.2 and VCC Code ASL-1336-F2. Indictment, R. 1.[1] On January 28, 2011, pursuant to a plea agreement, the Commonwealth amended the aggravated malicious wounding charge to

---

[1] "R." followed by a page number refers to the state court record in Jones' criminal case. References to hearing transcripts refer to the pre-trial hearings in that case.

malicious wounding and Jones entered a plea of no contest to that charge. H'rg Tr., Jan. 28, 2011, at 1.

The factual basis supporting the no contest plea was presented by the prosecutor at the plea hearing as follows:

> [O]n October 28th, 2009, Detective Mitchem of the City of Salem Police Department responded to a residence located on the Salem Commons Lane here in the City of Salem in reference to [a] two-month old child that EMS had taken to the hospital. The call had come into EMS that the two-month old baby was not breathing, but still had a pulse. When the EMS workers arrived, they made contact with the baby in this case. The baby with the initials S.N.J., who is the natural daughter of the defendant, Mr. Fred Eugene Jones, Jr.
>
> The EMS workers spoke to Mr. Jones there at the scene. Mr. Jones indicated that he and his wife had been with the child earlier in the day, that his wife had left, that he was alone with the little girl S.N.J., and also her three-year-old brother, that he had been feeding S.N.J., and that it appeared she began choking on something. He stated at that time that he administered several light abdominal thrusts in an attempt to dislodge whatever the child was choking on. He also told EMS workers that when he administered those thrusts, that some type of a thick mucousy substance came out of the child's mouth, and at that point she took a deep breath and began breathing, but her breathing was not normal. Therefore, he called EMS.
>
> When the detective arrived, EMS had already taken S.N.J. to Lewis Gale Hospital. When she arrived at Lewis Gale Hospital, Dr. Delaney, the ER doctor, ordered several tests, including a CT scan and x-rays. The results of the CT scan showed that there were several areas of bleeding on the brain of this two-month-old child. Due to the child's distress, she was transported to the Roanoke Memorial Hospital Pediatric Intensive Care Unit. . . .
>
> Once she arrived at Roanoke Memorial Pediatric Intensive Care Unit, Dr. John Facciani, who is a specialist in pediatric optomology [sic], conducted an eye examination of the child, S.N.J. During the course of his examination, he found as he described it too numerous to count hemorrhages on the back of the eyes of the child, S.N.J. He would testify that those were acute injuries; that they could not have been present on the eye for very long just due to the physiology of the eyes and how those things work themselves out.
>
> Detective Mitchem spoke to the defendant in this case. He was Mirandized, waived his Miranda rights, stated that he had been home with his daughter, was

feeding her when he thought she was choking. Mr. Jones advised the detective that he picked up his child and in his words slightly shook her, and he then pressed on her abdomen in an attempt to clear her throat. And at that time he thought she appeared to be fine, that she began crying later, and at that point was when he called 9-1-1.

If called to testify, various doctors in this case would [have] indicated that the explanations provided by the defendant were inconsistent with the serious injuries which they viewed in the child. In addition to the bleeding on the brain and hemorrhaging behind the eyes, there was also a broken collar bone. There was an old arm injury that had begun to heal, a break in the arm that was healing, and also as previously stated, the other brain injuries, which were also healed and showed some aid [sic] on them. If called to testify, the doctors would indicate that slight abdominal thrusts to the child would not cause these injuries. And again that Mr. Jones had provided no explanations regarding any type of extreme trauma to the child, such as a car accident or anything of that nature, which would account for these injuries.

In addition, the doctors noted that externally on the child there were no injuries in terms of bruising or cuts or anything which would also explain the presence of the internal injuries to the child's brain and to her eyes.

Id. at 6-8.

After the prosecutor presented the foregoing, the court asked if the injuries described were also known as "shaking the baby" syndrome. Id. at 9. The prosecutor responded:

It is also called the shaking baby syndrome. The doctors in this case were moving away from that diagnosis and calling it abusive head trauma, and they were just adamant that the type of injuries that this child received could not have been caused from the slight abdominal thrust, which was the explanation provided by the defendant. In fact, Dr. Facciani indicated that the trauma (inaudible) the child's brain and eyes would be something you would see for example as he stated in cases where children have pulled heavy objects over their head. However, in this case there were no external injuries which matched that explanation.

Id.

At the sentencing hearing held on March 23, 2011, the prosecutor reported to the court that S.N.J. was blind as a result of her injuries, could not speak, could not walk, was required

3

to wear braces on her arms and legs, and was developmentally delayed. Hr'g Tr., Mar. 23, 2011 at 14. The court sentenced Jones to a term of twenty years, with the last five years suspended, for a total of fifteen years. Id. at 18; Sent. Order, R. 147-151.

Jones filed a direct appeal with the Circuit Court of the City of Salem, asserting that the trial court erred in denying his motion for an expert witness prior to entry of his no contest plea. Jones v. Commonwealth, No. 0806-11-3 (Va. Ct. App. Dec. 2, 2011) (per curiam) (attached herein at ECF No. 8-3). The appellate court declined to address the issue because the record revealed no ruling by the trial court on Jones' motion for appeal, leaving no ruling for the court to review. Id. at 1-2. Jones also challenged his fifteen-year sentence as an abuse of discretion because the sentencing guideline recommended a midpoint sentence of four years. The appellate court found no abuse of discretion and affirmed the conviction and sentence. Id. at 2.

Jones next sought review by the Supreme Court of Virginia, arguing that the Court of Appeals erred by refusing to find that the trial court abused its discretion by denying his motion for the appointment of an expert and also erred by refusing to find that the trial court abused its discretion when it sentenced him. On June 4, 2012, the court dismissed the first count of the appeal, finding that the assignment of error did not address the Court of Appeals ruling. The court refused the second assignment of error, finding no reversible error. Jones v. Commonwealth, No. 120004 (Va. June 4, 2010) (attached herein at ECF No. 8-4).

Jones did not file a habeas corpus petition in state court or seek further review of his conviction until he filed the instant § 2254 petition for habeas corpus relief on November 27, 2019. Jones acknowledges that his petition is untimely and raises issues that may have been

4

procedurally defaulted because they were not first presented to a state court in Virginia. However, he claims that his case falls within the exception for actual innocence recognized by McQuiggin v. Perkins, 569 U.S. 383 (2013), and Schlup v. Delo, 513 U.S. 298 (1985), allowing the court to reach the merits of his otherwise untimely, procedurally defaulted claims of federal constitutional rights violations. Jones alleges that he received constitutionally ineffective assistance of counsel because trial counsel (1) failed to confer with a qualified medical expert to determine whether Jones had a valid defense against the malicious wounding allegation and (2) failed to secure expert testimony to assist in Jones' defense.

## II. Actual Innocence Claim

The parties agree that Jones' petition is untimely because he did not file it within the one-year limitations period set forth in 28 U.S.C. § 2244(d). The judgment became final upon conclusion of direct review, which in Jones' case was ninety days after June 4, 2012, the day the Supreme Court of Virginia entered judgment against him. 28 U.S.C. § 2244(d)(1)(A); Harris v. Hutchinson, 209 F.3d 325, 328, 328 n. 1 (4th Cir. 2000) (noting the ninety-day time period for filing a petition for writ of certiorari with the United States Supreme Court as set out in Sup. Ct. R. 13(1)). Ninety days after June 4, 2012 was September 2, 2012, making Jones' deadline to file his § 2254 petition September 2, 2013. Jones did not file his petition until November 27, 2019, which was more than six years too late.[2]

The Supreme Court has recognized a miscarriage-of-justice exception that seeks to "balance the societal interests in finality, comity, and conservation of scarce judicial resources

---

[2] Under § 2244(d)(2), a properly filed petition for state post-conviction relief will toll the running of the one-year limitation period, but Jones did not file a petition for state post-conviction relief.

with the individual interest in justice that arises in the extraordinary case." <u>Schlup</u>, 513 U.S. at 324. A credible claim of actual innocence serves as a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." <u>Id.</u> at 315. Such a claim must be supported by new reliable evidence.

> Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.

<u>Id.</u> at 316. "[T]he <u>Schlup</u> standard is demanding. The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court also is satisfied that the trial was free of nonharmless constitutional error.'" <u>McQuiggin</u>, 569 U.S. at 401 (quoting <u>Schlup</u>, 513 U.S. at 316). The petitioner "'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" <u>Id.</u> at 399 (quoting <u>Schlup</u>, 513 U.S. at 327).

If a court finds that the evidence is both reliable and new, it then considers "'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'" <u>Stedman v. Corcoran</u>, No. GLR-15-230, 2019 WL 1778634, at *4 (D. Md. April 23, 2019) (quoting <u>House v. Bell</u>, 547 U.S. 518, 538 (2006)). The court does not make an independent factual determination about what likely occurred, but instead assesses the likely impact of the evidence on reasonable jurors. <u>Id.</u> at *5 (quoting <u>House</u>, 547 U.S. at 538).

Jones submitted two types of "new evidence" in support of his actual innocence claim. The first is a sworn declaration from a woman identified as Dr. Danette Vercher, that he argues serves as newly discovered evidence that establishes his innocence. The second is what

6

he describes as "new and emerging medical and scientific evidence" that undermines the prosecution's hypothesis that S.J. was injured as a result of being shaken by Jones.

### A. Vercher Declaration

In Dr. Vercher's declaration, she identified herself as a pastor and counselor and stated that in 2009 she was in regular contact with Jones and his wife Lakiesha because she provided marital advice and spiritual guidance to both of them on a regular basis. Decl. of Dr. Danette Vercher, ECF No. 1-1 at ¶¶ 1-3. Dr. Vercher stated that in late October 2009 she received a series of strange telephone calls from Lakiesha in which Lakiesha told Dr. Vercher that her infant daughter "had a voice" and was talking to her. Lakiesha also purportedly told Dr. Vercher that Jones was talking to Dr. Vercher while also acknowledging that he was asleep next to her. Id. at ¶ 4. Dr. Vercher commented that Lakiesha's communications "reflected instances of her having a temper" and that she "exhibited paranoid behavior" in relation to interactions between herself, her husband, and other members of their church community. Id.

Dr. Vercher asserts that she was speaking to Jones during the afternoon of October 28, 2009, via video conference or Skype. While Dr. Vercher was talking with Jones, she saw Lakiesha in the background with a man she believed to be Lakiesha's brother. Dr. Vercher described what happened next:

> During the midst of my conversation with Fred, and without warning, Lakiesha suddenly approached Fred from behind, got his attention by saying "Here, take her" or something along those lines, and then forcefully threw [S.J.] into Fred's arms. From my angle, it was clear that Lakiesha had thrown [S.J.] in a violent manner, and her head and body jerked. Despite this fact, she did not appear to wake up or immediately respond once secured in Fred's arms.
>
> Fred appeared to lay [S.J.] on a couch or ottoman that was next to where he was sitting. A few minutes later, [S.J.] woke up with what sounded like a loud shriek or scream.

[S.J.] initially went quiet after this scream, and then Fred attempted to feed her. While he was feeding her she began choking.

Fred picked her up and then laid her back down and appeared to be trying to help her breath[e]. After a few moments, he said she was not breathing properly and that he was going to call 911. I stayed on the video or Skype call until medical personnel arrived at the house, and at that point the call ended.

After Fred was arrested, I had limited contact with him. He seemed distraught and seemed bent on punishing himself, even though he always was insistent that he never had done anything to hurt [S.J.]. Based upon my observations in 2009 of Fred, Lakiesha, and the dynamic between the two in relation to their children, I do not believe Fred was likely to have intentionally or maliciously hurt his children. On the other hand, my observations of Lakiesha, and my interactions with her, led me to believe that she was a potential danger to her children. I warned Fred at the time, but I do not believe he took any action in response to that warning.

Id. at ¶¶ 6-10.

The court first finds that this evidence is not new. If events transpired as described by Dr. Vercher, Jones knew that he had been on a Skype or video call with her on the day he was arrested and she could have described her version of events to investigators or to Jones' attorney at that time. However, there is no indication in the record that Jones told police that he was on a call with a potential witness when they talked to him on the day of the incident. Jones cannot now credibly claim that the information in Dr. Vercher's affidavit is new evidence.

The court further finds that the declaration of Dr. Vercher is not reliable evidence. A court may examine the timing of affidavits and the credibility the affiants would have when determining whether the evidence is reliable. Stedman, 2019 WL 1778634, at *10. First, as mentioned above, Dr. Vercher's declaration was filed more than ten years after S.J. was injured. It is well established that late-filed affidavits in a petition for habeas corpus are suspect. See

McDowell v. Lemke, 737 F.3d 476, 484 (7th Cir. 2013) (citing Morales v. Johnson, 659 F.3d 588, 606 (7th Cir. 2011)) (finding "eleventh hour" affidavit, containing facts not alleged at trial and accompanied by no reasonable explanation, inherently suspect); Pegues v. Hooks, No. 1:19CV610, 2020 WL 85103, at *30 (M.D.N.C. Jan. 7, 2020) (denying ineffective assistance of counsel claim in part because petitioner presented nothing "beyond a self-serving and unreliable, eleventh-hour affidavit" which did not rebut evidence presented at trial). Neither Dr. Vercher nor Jones offered any explanation for the ten-year delay in her coming forward to offer her description of what happened on October 28, 2009. Accordingly, the court finds Dr. Vercher's declaration to be inherently suspect based on the timing of its submission.

In addition, while Dr. Vercher described herself as having offered marital advice and general spiritual guidance to Jones and Lakiesha, evidence submitted by respondent indicates that Jones and Dr. Vercher were involved in an on-and-off extra-marital romantic relationship that has lasted many years. Email exchanges between Jones and Dr. Vercher, which are maintained by prison authorities, indicate that their romantic relationship existed at least as early as 2010. In an undated email from Dr. Vercher to Jones, in which Dr. Vercher appears to be discussing marrying Jones, she stated, "I've been waiting for 10 years, and missed opportunities because of the in [sic] and off relationship with you. 10 years and no results." ECF No. 8-7 at 32. Later in the email she stated, "I've been YOUR support system and remained single, while you went back to LaKiesha and ended up there. Your future and mine was taken." Id.

In another email sent from Dr. Vercher to Jones on June 21, 2015, she stated that they had been in a relationship for six-and-a-half years, indicating that they had been romantically

involved since early 2009. ECF No. 8-7 at 41. In an email sent on June 20, 2015, Dr. Vercher referred to herself as "Mrs. F. Eugene Jones Jr." Id. at 40. Prison records indicate that since Jones was transferred to the Lunenburg Correctional Center on December 17, 2013, Dr. Vercher has visited him four times. Aff. of Adrian Tucker, ECF No. 8-7 at 1. Jones called Dr. Vercher 233 times between May 2, 2019 and July 31, 2020. Id. at 2.

The emails, phone calls, and visits indicating that Dr. Vercher and Jones were involved in a long-term romantic relationship undermine Dr. Vercher's assertion that she had limited contact with Jones after he was arrested. Her false description of the length and nature of her relationship with Jones also undermines the credibility of her other statements regarding the events that occurred on October 28, 2009, as well as her description and opinion of Lakiesha Jones' behavior.

Additionally, the court is highly skeptical of Dr. Vercher's assertion that she saw, via Skype or video call, all that she claims to have seen. In order for Dr. Vercher to have seen what she claims, all of Jones' movements would have had to occur in front of a desktop computer screen, or Jones would have had to catch his daughter who was violently tossed to him, lay her down on a couch or ottoman, pick her up, feed her, attempt to help her breathe, and make an emergency call to 9-1-1, all while holding his phone or a tablet computer in a way that Dr. Vercher could see what was happening. Dr. Vercher's assertion that she witnessed these activities is simply unbelievable.

Finally, Dr. Vercher's description of what happened at the time S.J. was injured is inconsistent with what Jones told EMS workers and police happened on that day. Jones made no mention of his wife having roughly thrown S.J. at him and made no mention of putting S.J.

on a couch or ottoman or that she woke up with a scream or shriek. Rather, he stated only that she appeared to choke while she was eating and that he administered abdominal thrusts and gently shook her in an effort to dislodge anything that was causing her to choke. Although Jones submitted a new declaration with his application for habeas relief that mirrors that of Dr. Vercher, it suffers from the same lack of credibility that her affidavit does, in that it is inconsistent with his earlier description of events and fails to mention his long romantic relationship with Dr. Vercher. Decl. of Fred Jones, ECF No. 1-1.

Based on the foregoing, the court finds that Dr. Vercher's declaration is unreliable because she submitted it ten years after the incident occurred, she failed to disclose her long-term romantic relationship with Jones, her claim to have seen the events is not credible, and her description of what happened on October 28, 2009 is inconsistent with Jones' account of events at the time S.J. was injured. Coupled with the fact that the evidence is not new, it does not satisfy the stringent requirements of Schlup or allow Jones to overcome the fact that his habeas claim is time-barred.

### B. Scientific Evidence

Jones contends that new and emerging medical and scientific evidence undermines the prosecution's hypothesis that S.J.'s injuries occurred as a result of being shaken, which is sometimes referred to as Shaken Baby Syndrome (SBS). Although he did not submit any actual evidence with regard to his argument, he cites three law review articles and three articles from medical journals. See Keith Findley, et al., Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right, 12 Hous. J. Health L. & Poly. 209 (2012); Deborah Tuerkheimer, Science Dependent Prosecution and the Problem of Epistemic Contingency: A

Study of Shaken Baby Syndrome, 62 Ala. L. Rev. 513 (2011); Sandeep Narang, A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome, 11 Hous. J. Health L. & Poly. 505, 529-32 (2011); Sebire et al., Cerebral Venous Sinus Thrombosis in Children: Risk Factors, Presentation, Diagnosis and Outcome, 128 Brain 477 (2005); Michael V. Krasnokutsky, Cerebral Venous Thrombosis: A Potential Mimic of Primary Traumatic Brain Injury in Infants, 197 A. J. Roentology 503 (2011); Steven C. Gabaeff, Challenging the Pathophysiologic Connection Between Subdural Hematoma, Retinal Hemorrhage and Shaken Baby Syndrome, 12 West J. Emerg. Med. 144 (2011).

The court finds that while most of the articles were published after Jones entered his no contest plea, the general content of the articles is not new evidence. Brad Braford, counsel for Jones, submitted similar articles to the court while Jones' case was pending.  On July 23, 2010, Braford filed with the state court a law review article by Deborah Tuerkheimer, The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts, 87 Wash. Univ. L. Rev. 1 (2009), which discusses scientific research that casts doubt on diagnoses of SBS in child abuse cases. R. 41-98 (attached herein at ECF No. 8-11). At a hearing held on September 23, 2010,  Braford submitted to the court two additional articles: A Nuts and Bolts Approach to Litigating the Shaking Baby or Shaking Impact Syndrome, by Lieutenant Colonel Matthew D. Ramsey, and Shaking Baby Syndrome: A Genuine Battle of the Scientific and Not Scientific Experts from the School of Law, University of California, Davis. Hr'g Tr., Sept. 23, 2010, at 1, 4. Thus, the state court had before it information that SBS is not universally accepted as a diagnosis in child abuse cases and this court finds that the articles to which Jones refers in his motion are not "new evidence."

In addition, the court does not find that the law review articles are reliable evidence in the sense that Jones would not have been convicted had they been presented to the court prior to his plea of "no contest." The articles do not pertain to S.J., but generally call into question the diagnoses of SBS in child abuse cases, arguing that the SBS hypothesis lacks "a rigorous empirical foundation and sound scientific research" and also that there are plausible alternative causes of medical trauma in infants where prosecutors allege that they were injured after being shaken. ECF No. 1 at 23-24. Nothing in the articles addresses S.J.'s condition or discusses why the medical findings in her case were consistent or inconsistent with a diagnosis of SBS. General conclusions that SBS may not be a reliable diagnosis when a child shows particular types of injuries to her eyes and brain shed no light on what happened in S.J.'s case.

Jones points out that two of the articles make the case that venous thrombosis in an infant can often be caused by infection and can be mistaken for SBS. ECF No. 1 at 24 (citing the Sebire and Krasnokutsky articles). He also states that "medical records for S.J. confirm that she suffered from various medical problems even before the alleged SBS incident, resulting in numerous doctor visits." ECF No. 1 at 24. However, Jones neither provided the medical evidence to the court nor cited to the record where it could be found. Without doing so, his intimation that S.J. may have suffered from venous thrombosis rather than SBS is nothing but conjecture and falls far short of the requirement that he present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." McQuiggin, 569 U.S. at 401.

The same is true of Jones' citation to the Gabaeff article that SBS signs and symptoms can also be attributed to short household falls. Nothing in the record indicates that S.J. had

13

suffered a fall and Jones did not tell investigators that she had suffered a fall. Accordingly, the court finds that the evidence referenced by Jones is unreliable with regard to S.J.'s injuries because it does not address the findings by the doctors in her case.

Moreover, even if the articles were new and reliable evidence, in considering all the evidence in the case, the court does not find that it is not more likely than not that no reasonable juror would have convicted him in the light of the new evidence. McQuiggin, 569 U.S. at 399. As described above, in addition to having signs and symptoms of SBS, S.J. also had a broken collar bone, was healing from a broken arm, and showed signs of older bleeding in her brain. Also, when the prosecutor described the evidence in the case, she pointed out that the doctors were "moving away from" the SBS diagnosis and calling it abusive head trauma, because the injuries to S.J.'s brain and eyes were consistent with injuries children receive when they pull heavy objects onto their heads, although there were no external injuries which matched that explanation. The court finds that even if a jury were to hear that diagnoses of SBS are not supported by sound scientific research, the prosecutor would have other objective medical evidence showing that S.J. had been abused.

In sum, the evidence submitted and referred to by Jones demonstrates at most that he had a potentially defensible case, the outcome of which could not be predicted with certainty because a jury would resolve disputed questions of fact. Nothing about the evidence persuades the court that a factfinder presented with the evidence would have found Jones not guilty of malicious wounding. Because Jones has failed to establish the "actual innocence gateway," the court concludes that his claim is untimely.

14

### III. Ineffective Assistance of Counsel Claim

Jones claims that his attorney provided ineffective assistance of counsel during the plea process. Although this claim is time-barred, the court addresses it in the alternative, finding that it is simultaneously exhausted and procedurally barred, and also without merit.

#### A. Exhaustion and Procedural Default

Before a court may address a claim in a federal habeas petition, the petitioner must first have exhausted the claim in state court. 28 U.S.C. §§ 2254(b), (c); Kasi v. Angelone, 300 F.3d 487, 501 (4th Cir. 2002). A petitioner satisfies the exhaustion requirement by "fairly presenting" both the operative facts and the controlling legal principles to the state court. Id. (citing Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000) and Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997), overruled on other grounds by United States v. Barnette, 644 F.3d 192 (4th Cir. 2011)). Nevertheless, a claim that has not been presented to the highest state court may be treated as exhausted if the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court. Baker, 220 F.3d at 288. Jones did not present his ineffective assistance of counsel claim to the either the Circuit Court of the City of Salem or the Supreme Court of Virginia via an application for habeas corpus relief and it is now too late to do so. See Va. Code § 8.01-654(A)(2) (setting out time periods for filing state habeas action). Therefore, his claim is simultaneously exhausted and procedurally defaulted and the question becomes whether there is an excuse for his procedural default. Clark v. Clarke, 648 F. App'x 333, 339 (4th Cir. 2016) (per curiam).

In order to overcome the procedural default, Jones would have to show either cause and prejudice for the default, or make the actual innocence showing set forth above. Because

he does not make a "cause and prejudice" argument and has failed to make out a claim of actual innocence, the court finds that his ineffective assistance of counsel claim is procedurally defaulted and must be dismissed from federal review. See Reid v. True, 349 F.3d 788, 806-07 (4th Cir. 2003) (affirming denial of habeas corpus petition where petitioner failed to show cause and prejudice for procedural default or actual innocence).

### B. Merits of Ineffective Assistance of Counsel Claim

Even if Jones' claim were not time-barred, and even if he could overcome the procedural default, he would not be entitled to relief on the merits. Jones asserts that his attorney failed to secure expert testimony to assist in his defense, failed to investigate the pertinent scientific research and medical data that would have cast doubt on the conclusory SBS diagnosis, never discussed with him any of the medical or scientific issues related to SBS, and never discussed the specific ways a medical expert could have helped his case at trial. He claims that had he known of the medical, scientific, and factual information available to him in 2009, he would not have pled no contest to the malicious wounding charge.

Criminal defendants have a Sixth Amendment right to effective legal assistance. Strickland v. Washington, 466 U.S. 668, 687 (1984). In order to establish that counsel's assistance was not reasonably effective, a defendant must satisfy a two-prong analysis: he must show both that (1) counsel's performance fell below an objective standard of reasonableness; and (2) he was prejudiced by counsel's alleged deficient performance. Id. at 669.

When considering the reasonableness prong of Strickland, courts apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The court must judge counsel "on the facts of the particular case," and

assess counsel's performance "from counsel's perspective at the time." Id. To satisfy the prejudice prong of Strickland, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Because Jones pled "no contest" to the malicious wounding charge, he can only allege ineffective assistance of counsel as it relates to the voluntariness of his guilty plea.

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of his constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in [McMann v. Richardson, 397 U.S. 759 (1970)].

Tollett v. Henderson, 411 U.S. 258, 267 (1973). "A guilty plea is valid if it 'represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" United States v. Moussaoui, 591 F.3d 263, 280 (4th Cir. 2010) (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)). When looking at the constitutional validity of a guilty plea, "'courts look to the totality of the circumstances surrounding [it], granting the defendant's solemn declaration of guilt a presumption of truthfulness.'" Id. (quoting Walton v. Angelone, 321 F.3d 442, 462 (4th Cir. 2003)).[3]

---

[3] A plea of "no contest" has the same effect as a guilty plea in that it waives allegations of constitutional violations that occur prior to entry of the plea. Lilley v. Joiner, No. 5:16-cv-31-FDW, 2016 WL 7238827, at *3 (W.D.N.C. Dec. 14, 2016) (citing Howard v. White, 76 F.App'x 52, 53 (6th Cir. 2003)).

When a petitioner argues that he received ineffective assistance of counsel as part of a plea agreement, he must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985).

> [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

Id. The petitioner "'must convince the court'" that the decision to go to trial "'would have been rational under the circumstances.'" United States v. Fugit, 703 F.3d 248, 260 (4th Cir. 2012) (quoting Padilla v. Kentucky, 559 U.S. 356, 372 (2010)). "[W]hat matters is whether proceeding to trial would have been objectively reasonable in light of all the facts." Id.

A review of the record in this case shows that the advice from Jones' attorney to plead no contest was objectively reasonable given the circumstances. On June 1, 2010, Braford filed a motion and supporting brief asking the court to appoint an expert in Jones' case. R. 18-22. At a hearing on June 30, 2010, Braford again asked the court to appoint an expert who was both a forensic pathologist and an attorney to review the medical records in the case, telling the court that "there is a lot of discussion in the literature about whether or not the so called shaking baby syndrome is a legitimate diagnosis or legitimate claim." He added, "there is the opposing theory that the shaking baby syndrome does not meet the—or is not a scientific valid conclusion based upon the evidence." Hr'g Tr., June 30, 2010, at 2.

18

The court asked Braford for some literature on the issue and agreed to take the motion to appoint an expert under advisement. Id. at 3. On July 23, 2010, Braford filed with the court the law review article from Deborah Tuerkheimer described above, which discussed SBS and the criminal courts. R. at 41-98 (attached herein at ECF No. 8-11 at 1-58).

At a hearing on September 23, 2010, Braford submitted two additional articles, A Nuts and Bolts Approach to Litigating the Shaking Baby or Shaking Impact Syndrome, by Lieutenant Colonel Matthew D. Ramsey, and Shaking Baby Syndrome: A Genuine Battle of the Scientific and Not Scientific Experts from the School of Law, University of California, Davis. Hearing Tr., Sept. 23, 2010, at 1, 4. Braford also told the court that "there are literally thousands of articles, and I've tried to find several that would have some information, but not overwhelm the court. . . ." Id. at 4. The court responded that he had read the previous article submitted by the attorney and added, "I don't mind telling you it was some social scientist making some big guesses, and he ended up saying somebody ought to consider whether or not this is an area that we need to look at a lot closer. . . . Didn't convince me." Id. at 5. Despite the court's skepticism, it authorized the payment of $500 for medical document review. Id. at 3; R. 102-03.

At a hearing on October 22, 2010, the court commented that the motion for appointment of an expert was pending and also commented that he had read all the articles Braford had given him. Hr'g Tr., Oct. 22, 2010, at 1. He further commented that he found the articles to be "almost speculation" about what the law should be. He added that they "were arguing medical slash legal arguments that did not appear to be the law in the Commonwealth of Virginia." Id.

19

The court noted that the case was set for trial on January 27, 2011 and added the following:

> OK. I will tell you right now it does not appear on the face of it from what I've read and seen that the Court would authorize an expert. I've granted you the funds to hire the expert to review the documents for you so you can make your argument. My suggestion would be that if you need to—if you still think this is going to come through, that you're going to need to schedule a date sometime between now and January, but you need to start preparing your case with the idea in mind that the Court, at this stage, is not convinced that the expert that you're requesting is appropriate in this case, and the Court is not convinced that even if you came up with funds to hire him yourself that the Court would let him testify. . . . Alright. So no decision is made on the expert at this time, but I was just giving you the way—the Court's thinking so you'll understand where you'll have to come.

Id. at 2. Approximately two months later, on January 28, 2011, Jones pled no contest to the malicious wounding charge. Hr'g Tr., Jan. 28, 2011.

It is clear from Braford's comments that he had investigated the pertinent scientific research and medical data regarding SBS and the premises underlying the diagnosis in child abuse cases. In addition, even if Braford did not explain the state of research dealing with SBS to Jones, Jones was present at all the hearings where the SBS theory of injury was discussed and where Braford sought to have the court consider evidence that undermined the SBS theory. Also, while Braford did not obtain a ruling on the motion to appoint an expert, it was reasonable for him to assume, based on the court's comments, that the court was not going to grant the motion. In addition, Jones' argument that had he known of the medical, scientific, and factual issues relating to SBS in 2009, he would not have pled no contest is implausible, given the doubt expressed by the court about the information regarding SBS in the articles Braford submitted. To be sure, Jones could still have insisted on his right to go to trial, but

Braford did not provide ineffective assistance of counsel by recommending to Jones that he plead no contest.

Moreover, regardless of whether Braford properly researched SBS and whether he properly informed Jones regarding any defenses he may have had to a theory of injury caused by SBS, medical evidence in the record indicated that S.J. also had a broken collar bone and a broken arm. Braford had a duty to weigh that evidence as well when making his recommendation to Jones about entering into the plea agreement. Finally, before the charge was reduced from aggravated malicious wounding to malicious wounding, Jones faced a sentencing range of five years to life. The result of entering the plea agreement was that he faced a sentencing range of five to twenty years. Hr'g Tr., Jan. 28, 2011, at 5.

Given the evidence in the record regarding SBS defenses and Braford's attempts to have the court consider them, the evidence of S.J.'s injuries in addition to those she incurred from being shaken, and the benefit Jones obtained from the plea agreement, the court finds that Braford rendered effective assistance of counsel when he advised Jones to plead no contest to the charge of malicious wounding. Jones' arguments to the contrary are not supported by the record and otherwise are without merit.

## IV. Certificate of Appealability

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability. Fed. R. Gov. § 2254 Cases 11(a). A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were

21

adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000). In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right. Gonzalez v. Thaler, 565 U.S. 134, 140–41 (2012). Jones has not made a substantial showing of the denial of a constitutional right.

## V. Conclusion

For the foregoing reasons, the court **GRANTS** grant respondent's motion to dismiss, ECF No. 6, **DISMISSES** the petition for a writ of habeas corpus, and **DENIES** a certificate of appealability.

An appropriate order will be entered.

Entered: 10/02/2020

Michael F. Urbanski
Chief United States District Judge